**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **ROBERT E. DICKERSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) CIVIL NO. 08-716-GPM |
| | ) |
| **BELLEVILLE AREA COMMUNITY** | ) |
| **COLLEGE DISTRICT 522; BOARD OF** | ) |
| **TRUSTEES OF COMMUNITY COLLEGE** | ) |
| **DISTRICT 522; and SOUTHWESTERN** | ) |
| **ILLINOIS COLLEGE,** | ) |
| | ) |
| **Defendants.** | ) |

# MEMORANDUM AND ORDER

**MURPHY, District Judge:**

Plaintiff Robert E. Dickerson has a mental impairment that he claims qualifies him as a disabled person under the Americans With Disabilities Act (ADA), 42 U.S.C. § 12111, *et seq.* He was employed by Defendants[1] as a permanent, part-time custodian from November 3, 1999, until he was terminated on September 10, 2008. Plaintiff claims that Defendants discriminated against him on the basis of an actual and/or perceived disability and retaliated against him for exercising his rights under the ADA. Defendants move for summary judgment on the grounds that (1) Plaintiff is not disabled as defined under the ADA and (2) any adverse employment action was due to

---

[1]Defendants contend that the real party in interest is Southwestern Illinois College, f/k/a Belleville Area College, Community College District No. 522. However, they have not sought summary judgment on behalf of any misnamed defendant on that basis alone and have jointly defended the action and moved for summary judgment on the merits. The identity of Plaintiff's employer makes no difference to this analysis. Accordingly, the Court refers to all the named defending parties as "Defendants" or "SWIC."

Plaintiff's unsatisfactory job performance. For the following reasons, Defendants' motion is granted.

**FACTUAL BACKGROUND**

In August 2007, Plaintiff applied for four open positions as a full-time custodian. In February 2008 – after the positions were awarded to employees that Plaintiff claims have inferior experience and qualifications to his own – Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), claiming that Defendants violated the ADA by refusing to award him one of the available full-time positions. On September 10, 2008, Plaintiff was terminated from his part-time position.[2] Plaintiff thereafter filed another Charge of Discrimination, which includes retaliation allegations, with the EEOC based on the termination.

**DISCUSSION**

The standard applied to summary judgment motions filed under Rule 56 is well-settled and has been succinctly stated as follows.

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, [the court] must view the record in a light most favorable to the nonmoving party. Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. The evidence must create more than some metaphysical doubt as to the material facts. A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

---

[2]Plaintiff was reinstated to his part-time position as a result of the arbitrator's ruling in a union grievance proceeding. His reinstatement is not particularly relevant to the claims presented under the ADA for reasons discussed herein.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (internal citations and quotations omitted). The Court is mindful of this standard in its recitation of the facts above. Additional facts will be discussed in relation to the legal standards applicable to discrimination and retaliation claims brought under the ADA.

>   Discrimination Claim

>   The ADA anti-discrimination provision provides:

>   No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).[3] For these purposes, "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). To prove disability discrimination under the ADA, a plaintiff may proceed under the direct or indirect methods. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). The two types of permissible evidence under the direct method are direct evidence and indirect evidence. *Id.* Direct evidence "'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus,'" while indirect evidence "is evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Id.*, *quoting Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003).

---

[3]Pursuant to the ADA Amendments Act of 2008, Pub. L. No. 110-325, 112 Stat. 3553 (codified as amended at 29 U.S.C. § 12101 *et seq.*), certain amendments to the ADA became effective on January 1, 2009. The United States Court of Appeals for the Seventh Circuit has held that these amendments to the ADA are not retroactive. *See, e.g., Winsley v. Cook County*, 563 F.3d 598, 600 n.1 (7th Cir. 2009). Because Plaintiff filed this action before the effective date of the amendments, the Court evaluates his claims under the ADA of 1990.

A plaintiff also may proceed under the indirect method of proof, "which first requires him to establish a prima facie case of discrimination" by showing that: "(1) he is disabled under the ADA; (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) he has suffered from an adverse employment decision because of the disability." *Buie*, 366 F.3d at 503; *accord Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007). Where a plaintiff's discrimination claim centers on alleged disparate treatment, courts analyze the prima facie requirements as a four-part test, wherein a plaintiff must show: (1) he is disabled with in the meaning of the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability received more favorable treatment. *Lloyd v. Swifty Transportation, Inc.*, 552 F.3d 594, 601 (7th Cir. 2009), *citing Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 548 (7th Cir. 2008); *see also Bodenstab v. Cook County*, 569 F.3d 651, 657 n.2 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1059 (2010). The substance of the elements – and generally the result they produce – is the same, but the four-part test tracks more closely the elements for a retaliation claim and enables courts to consider the claims together under the indirect method. *See generally Lloyd*, 552 F.3d at 601.

Once a plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate a nondiscriminatory reason for each adverse employment action." *Buie*, 366 F.3d at 503. If the employer meets its burden, then the plaintiff must prove by a preponderance of the evidence that the employer's "proffered reasons were a pretext for intentional discrimination." *Id.*[4] To show

---

[4]This indirect, burden-shifting method of proof was established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 548 (7th Cir. 2008).

"pretext," which means "a dishonest explanation" – "a lie rather than an oddity or an error," the plaintiff must prove that the employer's explanation is "unworthy of credence." *Bodenstab*, 569 F.3d at 657. As long as the employer honestly believes its reasoning, it does not matter that the decision was "mistaken, ill considered or foolish." *Id*. The second prong of the prima facie case (i.e., job performance) and the pretext question merge where the employer argues that its reason for not promoting or terminating the plaintiff is based upon substandard performance. *Lloyd*, 552 F.3d at 602. Specific job requirements – and an individual's performance of those requirements – are determined by the employer, not a court, and courts "will not second-guess that decision." *Id*. at 601.

Having carefully reviewed the brief opposing summary judgment, it appears that Plaintiff attempts to pursue the direct method of proof on his termination and retaliation claims; that evidence will be addressed in turn. He has not presented direct evidence of discrimination on his failure to promote claim, although he cites statements that he claims are direct evidence (*see generally* Doc. 42-13, Answer to Interrogatory #4). The Court will discuss these comments in the context of the failure to promote claim.

With respect to Plaintiff's attempt to establish discrimination under the indirect method, this Court can assume, without deciding, that Plaintiff established a prima facie case. *See Bodenstab*, 569 F.3d at 657 ("While the question of pretext arises only after a plaintiff has established a prima facie case of discrimination and the employer has countered with a legitimate non-discriminatory reason for the adverse action, we can skip over the initial burden-shifting of the indirect method and focus on the question of pretext."). Therefore, the Court need not pass on the parties' competing arguments regarding whether Plaintiff is disabled or whether he was perceived by his employer as

disabled. Rather, the Court must consider whether Plaintiff has presented any evidence calling into question the sincerity of Defendants' belief that Plaintiff's "mediocre work history" prevented his promotion and that his "unsatisfactory performance" warranted termination (*see* Doc. 56-4, Answers to Interrogatories ##5 and 8).

*Failure to Promote Claim*

Plaintiff was supervised by Ken Deffenbaugh, the Assistant Director of the Physical Plant for SWIC's Belleville campus; Deffenbaugh was supervised by David Buesch, the Director of the Physical Plant for the entire district. When a full-time employment position becomes available in his department, Buesch forms a committee of SWIC employees to conduct interviews of candidates and vote on which candidate to hire. Buesch recommends who to hire to his boss, Robert Hilgenbrink, the Vice President of Administrative Services.[5] Hilgenbrink takes the recommendation to the Board of Trustees (the Board), which makes the ultimate hiring decision. When Plaintiff applied for the full-time custodian position in 2007, the committee consisted of Buesch, Gary Gruenert, and Jerry Ainsworth.[6] They each reviewed one-third of the 200 total applications and narrowed the pool down to 24 applicants to receive a first interview. All part-time workers who applied, including Plaintiff, received a first interview based solely on the fact that they were part-time workers in the department. During his deposition, Buesch estimated that nearly half of the 24 candidates to receive a first interview were part-time employees. The committee decided that there

---

[5]Robert Hilgenbrink was the Vice President of Administrative Services at all times relevant to this action, but he no longer holds that position.

[6]There is some discrepancy in the record whether Ken Deffenbaugh was on this committee. This question is immaterial to this analysis, as David Buesch was the hiring manager in this instance.

were better applicants for the available full-time positions who were more deserving of a second interview because (1) other applicants provided better answers to questions during the interview and (2) two part-time employees had a better work ethic than Plaintiff. According to Buesch, Plaintiff is lazy: he wanders off of jobs; he does not complete jobs in a timely manner; and he does not follow through on work. Buesch testified that he's held this opinion of Plaintiff since 2004 or 2005. This is consistent with the fact that Plaintiff twice before had unsuccessfully applied for full-time custodian positions at SWIC. Plaintiff applied for these positions in December 2004 and December 2005; received an interview, along with all of the part-time employees who applied; and was not hired based on his "mediocre work history with SWIC" (Doc. 56-4, Answer to Interrogatory #8).

Plaintiff contends that one of the successful applicants, Joseph Evansco, did not have the requisite one year of prior custodial experience and argues that this fact suggests that Plaintiff was passed-over improperly. But Buesch testified that Evansco's resume stated that he had the requisite experience (*see* Doc. 42-12). Whether Evansco had the requisite experience is beside the point for this Court's purposes. Plaintiff argues that Evansco was ill qualified for the job but was offered the job because he is related to someone on the Board. Plaintiff's implication that Evansco was hired because of nepotism fails to establish that Plaintiff's disability or perceived disability had anything to do with the decision or that Defendants' reason for not hiring *Plaintiff* is false. The Court similarly views Plaintiff's proffered evidence that when he asked Buesch why he didn't receive a second interview in light of his many years of experience, Buesch responded that Plaintiff's experience "meant nothing" and that he could train someone to do the work. This comment does not show a prohibited animus on Buesch's part and, moreover, is consistent with Buesch's reasoning as to why Plaintiff was not interviewed a second time. Lastly, Deffenbaugh's warning to Evansco

that he should stay away from Plaintiff if Evansco wanted a full-time job does not reflect discriminatory animus; it merely reflects the proffered explanation that Plaintiff was not a highly-regarded worker. Plaintiff has not come forward with any evidence to rebut Defendants' contention that other candidates had a better work ethic than his. In employment discrimination parlance, Plaintiff has failed to prove by a preponderance of the evidence that Defendants' explanation for not promoting him – i.e., his mediocre work history with SWIC – is dishonest or unworthy of credence. *See Bodenstab*, 569 F.3d at 657. Consequently, Plaintiff's failure to promote claim fails.[7]

*Termination Claim*

Plaintiff contends that he was terminated because of his disability or perceived disability. He also alleges that he was terminated in retaliation for filing a claim with the EEOC. This discrimination claim and the retaliation claim involve Plaintiff's termination. They both will be discussed below, under the rubric of retaliation, because the facts and analysis applicable to both claims substantially overlap.

Retaliation Claim

The ADA anti-retaliation provision provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

---

[7]The Court finds it unnecessary to address other comments that seem to go to the question of perceived disability (*see* Doc. 42-13, Answer to Interrogatory #4). Certain comments made by Larry Friederich will be addressed in the context of Plaintiff's retaliation claim.

42 U.S.C. § 12203(a).[8] Importantly, a finding that a plaintiff is not disabled does not foreclose a retaliation claim because the ADA "prohibits an employer from retaliating against an employee who has raised an ADA claim, whether or not that employee ultimately succeeds on the merits of that claim." *Squibb*, 497 F.3d at 786. Similar to a discrimination claim, a plaintiff may prove a retaliation claim under the ADA using either the direct or indirect methods. To establish unlawful retaliation under the direct method, a plaintiff must show: "(1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two." *Id*. With respect to the causal link element, suspicious timing is rarely enough to create a triable issue; but in extreme cases, where the adverse impact comes "on the heels" of the protected activity, it is enough to establish a causal link between the protected activity and the adverse action. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009); *citing McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997). To prove retaliation under the indirect method of proof, a plaintiff must show: "(1) that [he] engaged in protected activity; (2) that [he] was subject to an adverse employment action; (3) that [he] was performing [his] job satisfactorily; and (4) that no similarly situated employee who did not engage in protected activity suffered an adverse employment action." *Squibb*, 497 F.3d at 788.

Sometime during 2006, the Board issued a new policy for supervisors to evaluate part-time employees. Apparently, full-time employees had been evaluated for some time, and the unionization of the part-time employees prompted the change in policy.[9] At the time Plaintiff applied for the full-

---

[8]The 2009 amendments did not modify this subsection. Because the anti-retaliation provision of the ADA, 42 U.S.C. § 12203(a), uses similar language to that used in Title VII, 42 U.S.C. § 2000e-3(a), courts look to Title VII retaliation cases for guidance in deciding retaliation claims under the ADA. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009).

[9]Deffenbaugh testified that he has been evaluating the full-time employees that he supervises since 1985 and that he uses the same criteria as instituted for the part-time employees.

time position in August 2007, he had not yet been evaluated. Plaintiff attended a Board meeting in October 2007 – during which the Board was scheduled to take action on the hiring recommendations made by Hilgenbrink based on Buesch's and the committee's recommendations – and made a public comment regarding SWIC's hiring practices, stating that he believed he was being overlooked because of personal traits and asking the Board to wait one month to take action on the recommendations so that his claim could be reviewed. The Board Chairman, Nick Mance, recommended that Plaintiff make a formal written complaint to Hilgenbrink, and the Board approved the recommendations and appointed the four full-time custodians later in the meeting.

Deffenbaugh completed Plaintiff's evaluation on December 18, 2007, for the period covering November 2, 2006, to November 3, 2007. In a total of seven categories, Plaintiff received a "satisfactory" rating in 4 categories and an "unsatisfactory" rating in 3 categories. He received no "good," "very good," or "outstanding" ratings. His overall rating was "unsatisfactory." As part of the performance evaluation, Deffenbaugh completed a "Correction Action Plan" for each of the three areas in which Plaintiff received an "unsatisfactory" rating. The correction plans state that a progress review would be made at six-month intervals to monitor Plaintiff's performance levels.

On December 18, 2007, Deffenbaugh and Buesch met with Plaintiff to review the performance evaluation and correction plans. Deffenbaugh testified that while reviewing the evaluation, Plaintiff became irate, refused to sign it, and walked out of the meeting. There appears to be some question whether the correction plans actually were reviewed before Plaintiff walked out of the meeting.[10] Plaintiff testified that he was given copies of the plans. It is clear that he never

---

[10]The Court is unable to put together a succinct chronology because of the piecemeal manner in which the parties submitted deposition testimony.

signed them. On January 2, 2008, Plaintiff filed a grievance related to his performance evaluation. Buesch denied the grievance in March 2008 because the negative evaluation, by itself, was not discipline and, therefore, was not grievable under the collective bargaining agreement.

In February 2008, Plaintiff filed his charge of discrimination with the EEOC relating to his failure to promote claim. On July 17, 2008, Plaintiff's correction plans were updated to reflect that Plaintiff had improved in the area of securing college equipment but had not improved on being a team worker, on communicating with his supervisor before leaving a task, or on completing his share of the work load. Deffenbaugh discussed the progress evaluation with the Vice President of Human Resources, Larry Friederich, who opined that termination proceedings should be started because Plaintiff had not made satisfactory progress.[11] On August 27, 2008, Deffenbaugh and Friederich met with Plaintiff to give him a memorandum explaining that Deffenbaugh recommended to Buesch and Hilgenbrink that Plaintiff's employment be terminated due to poor performance and that the recommendation was approved. Although the termination became effective on September 10, 2008, Plaintiff was relieved of his duties on August 27th. Plaintiff filed another charge with the EEOC relating to his termination.

Plaintiff also filed a grievance over his termination. The arbitrator found that SWIC did not have "just cause" to terminate Plaintiff as required under the collective bargaining agreement but, instead, should have followed a course of progressive disciplinary action as required by the agreement. The arbitrator reinstated Plaintiff to his part-time position and reduced the termination to a written warning. Finding that SWIC failed to employ progressive discipline as required under

---

[11]Friederich testified that he had reviewed the original evaluation and correction plans with Deffenbaugh before Deffenbaugh and Buesch met with Plaintiff to review them.

a collective bargaining agreement is different than finding that Defendants discriminated and/or retaliated against Plaintiff based upon a disability or perceived disability. Therefore, this Court rejects Plaintiff's suggestion that "substantial deference" be given to the arbitrator's ruling.[12]

It is true that Deffenbaugh's negative performance and progress evaluations, which were subjective, led to Plaintiff's termination. But it is not for this Court to second guess the employer's determination whether an employee satisfactorily performs his job requirements. *See Lloyd*, 552 F.3d at 601; *see also Brill v. Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir. 1997) (in Title VII case, "the question is not whether the employer's performance ratings were *right* but whether the employer's description of its reasons is *honest*"). This Court recognizes "the ease with which employers may use subjective factors to 'camouflage discrimination.'" *Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449, 457 (7th Cir. 1991) (citation omitted) (age discrimination case). "To prevent employers from masking discrimination behind an incantation of subjective factors, [this Circuit has] held that, under many circumstances, subjective factors may be insufficient to justify the employer's hiring [or firing] decision." *Id*. But merely "[d]emonstrating that an interview process is influenced by subjective factors does not go any distance toward proving that [Plaintiff's disability or perceived disability] were among those subjective factors." *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 515 (7th Cir. 1996) (Title VII disparate treatment case).

Here, there is no evidence to suggest that the negative performance evaluation completed by Deffenbaugh in December 2007 was based upon anything other than his experiences with

---

[12]Plaintiff states in an affidavit that since being reinstated, he has been "subjected to hostility on the job by [his] supervisor" (Doc. 56-1). Plaintiff has not presented anything rising to the level of an adverse action and, in fact, has not amended his complaint to include any such allegations. Therefore, the Court will not consider this further.

supervising Plaintiff. The Court rejects Plaintiff's suggestion that the evaluation was issued in retaliation for Plaintiff's complaints at the Board meeting. First, Deffenbaugh testified that he never saw the Board meeting minutes describing Plaintiff's complaints. Second, the evaluation period coincides with the anniversary date of Plaintiff's hiring – November 3, 1999 – so, the timing is not suspicious. Third, the record shows that other part-time employees were evaluated under the same method as Plaintiff; the timing of each of those evaluations was based upon that employee's anniversary date of hire. So Plaintiff was not singled-out by being evaluated. Fourth, the perception that Plaintiff is lazy was established before he was evaluated and is reflected in each of his unsuccessful applications for full-time positions in 2005, 2006, and 2007. Plaintiff has failed to establish that his employer's views of his work have changed since he complained about discrimination.

Plaintiff points to a comment made by Larry Friederich as direct evidence of retaliation. Specifically, sometime during Fall 2007, Friederich made a comment to the effect that "you are suing your employer and you should not be suing your employer." Friederich explained during his deposition that Plaintiff approached him and asked him what it would take for Plaintiff to get hired full-time. Friederich responded that Plaintiff needs to stop arguing with his supervisors, needs to stop filing complaints every time he is unhappy, and needs to be a team player. Plaintiff does not deny that he approached Friederich, and Friederich does not deny that he made the statement quoted by Plaintiff.

Any Vice President of Human Resources should pause before casually passing off what he or she understands to be a "common sense" aphorism, regardless of the context (*see* Doc. 56-15). Keep in mind that a Human Resource V.P. is an expert who brings something to the table beyond

mere common sense. It is commonly thought that what passes as common sense is equally distributed among the general public without regard to education, training, intelligence, etc. That being so, the safer practice is for the expert to stick to his or her field of expertise. However, the awkwardness of this comment, which is surely good advice, does not, by itself, make it unlawful or establish that unlawful action was taken.[13] This comment was made in the context of Plaintiff's failed promotion. Friederich had no involvement in that decision, other than his office accepting and compiling the applications. While the comment was made possibly only a month or two before Deffenbaugh completed Plaintiff's negative performance evaluation, the record reflects that Friederich's involvement in that process was only tangential. And the comment is too remote in time to show that it had anything to do with the decision to proceed with termination in July 2008. In order for the Court to consider this remark as direct evidence of retaliation or discrimination, is must be related to the employment decision in question, namely Plaintiff's termination. *See generally Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 611 (7th Cir. 2001); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998). This comment is insufficient to create a triable issue of material fact because there is no showing that it was causally related to the termination decision making process. *See Oest*, 240 F.3d at 611. Friederich described Plaintiff as an employee that frequently complained. This comment was made before Plaintiff's EEOC charge was filed, and it is not even clear whether it was made before or after Plaintiff complained during the October 2007 Board

---

[13]Friederich additionally testified: "As an HR guy, I'm keenly aware that employees like Bobby who make complaints on any number of issues set themselves up with safe harbors. They create another hurdle for the employer to do what the employer would have done anyway absent those complaints." (Doc. 56-15). He seems to have a good understanding of what is acceptable and unacceptable (and notably, the arbitrator found him to be an impressive and knowledgeable witness) but may simply have used an unfortunate choice of words in this situation.

meeting.

Plaintiff has failed to establish a causal connection between the protected activity and his termination, so his retaliation claim fails under the direct method of proof. He likewise has failed to show that he was performing his job satisfactorily and that, therefore, Defendants' reason for terminating him was pretextual; therefore, his termination and retaliation claims fail under the indirect method of proof.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Doc. 40) is **GRANTED**, and this action is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: 09/24/10

s/ *G. Patrick Murphy*
G. PATRICK MURPHY
United States District Judge